UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOHN VANDER LEEST,

       Plaintiff,

   v.                                                Case No. 09-C-125

DAVID STEFFENS, et al.,

       Defendants.

**DECISION AND ORDER**

In the early morning hours of March 16, 2008, Green Bay Alderman John Vander Leest was pulled over by Green Bay Police Officer David Steffens, and ultimately arrested and given a citation for driving under the influence of an intoxicant. Steffens began following Vander Leest as he left a bar in downtown Green Bay after former Green Bay Police Officer Daniel Schmeichel, who happened to be at the same bar, telephoned Steffens and reported that Vander Leest had gotten into his car to leave and appeared drunk. A laboratory test on the sample of Vander Leest's blood taken as part of the investigation subsequently revealed that his blood/alcohol content was .031, less than half the legal limit of .08.[1] Upon reviewing the lab test results, Police Chief James Arts concluded that there was insufficient evidence to support a conviction for driving under the influence and voided the citation. Unfortunately, by that time Vander Leest's arrest had already been reported in the local media.

---

[1] Alcohol concentration in blood is measured by the number of grams of alcohol in 100 milliliters of a person's blood. Wis. Stat. § 885.235(1)(a).

Convinced that Officer Steffens and Lieutenant Jerry Johnson, who supervised the arrest, had targeted him for an unlawful arrest because of his position in City government, Vander Leest brought this action under 42 U.S.C. § 1983, alleging they had violated his rights under the Fourth and Fourteenth Amendment to the United States Constitution. Vander Leest also asserted state law claims against Steffens and Johnson for common law torts of false arrest and imprisonment and intentional infliction of emotional distress, and a state statutory claim of conspiracy to injure him in his reputation, trade, business or profession in violation of Wis. Stat. § 134.01. The City of Green Bay was named as a defendant based on its statutory duty to indemnify its employees for liability incurred while acting in the scope of their employment, *see* Wis. Stat. § 895.46, and the City's insurer was named based on its duty to indemnify the City and its employees under its policy. Finally, Vander Leest asserted a claim against Schmeichel for defamation. The case is presently before me on the defendants' motions for summary judgment. For the reasons given below, the motions will be granted, except as to Vander Leest's claim for defamation against Schmeichel which is dismissed without prejudice for lack of federal jurisdiction.

**I. Background**

As an alderman, Vander Leest had numerous interactions with the police department. He was chairman of the finance committee, where he impacted the department's budget, and in that capacity he sided with the police chief in eliminating the department's K-9 unit. This caused several officers to resent Vander Leest, and Vander Leest notes that the committee meeting at which the K-9 unit was discussed was a boisterous affair. (PPFOF ¶¶ 2-3.) In addition, Vander Leest served as a member of the city council's personnel committee, where he tended to side with the police chief on grievances filed by officers. (PPFOF ¶ 4.)

Vander Leest asserts that his actions as an alderman caused him to be singled out on the night in question. On March 15, 2008, Vander Leest admits he had been at several bars and a bowling alley, and that he had at least five drinks over the course of the evening. Vander Leest finished the evening at Ned Kelly's bar in downtown Green Bay. Also present at the bar was Defendant Daniel Schmeichel, a former Green Bay police officer. Schmeichel recognized Vander Leest as an alderman but did not know him personally. Prior to his leaving the Green Bay Police Department, Schmeichel had served as a union representative (end of 2005 to early 2007), and in that capacity he had attended a "handful" of personnel committee meetings. (PPFOF ¶ 10.) On those occasions, Vander Leest had a "consistent position" of denying grievances pursued by the officers' union.

Schmeichel claims that when Vander Leest arrived at Ned Kelly's he appeared unsteady on his feet and his eyes had an unusual look to them, though this is sharply disputed by Vander Leest, whose version is supported by several friends who were with him. (DPFOF ¶¶ 35-40.) In any event, Schmeichel told Green Bay Police Officer David Steffens, who was sitting in his patrol car outside the bar, that Vander Leest was inside and appeared drunk.[2] Schmeichel knew Steffens from his previous employment with the Police Department. Officer Steffens told Schmeichel to call him if Vander Leest got into a car to drive and still appeared drunk. At closing, Schmeichel followed

---

[2]Schmeichel testified that he used this kind of cautionary, non-committal language. Steffens, however, believed Schmeichel told him that Vander Leest was stumbling drunk. Because both Defendants have moved for summary judgment, the disparity in their testimony means that I must accept different versions of the facts depending on which motion I am ruling on. Specifically, for purposes of Steffens' motion I must accept Schmeichel's story that he merely said he "thought" Vander Leest was drunk (as the weaker report weakens Steffens' reasonable suspicion for the stop), but for Schmeichel's motion I must accept Steffens' version that Schmeichel said Vander Leest was stumbling drunk.

3

Vander Leest outside as he left, called Officer Steffens on his cell phone and reported that Vander Leest was getting into his car and he appeared drunk. Schmeichel admitted he was not 100 percent sure and told Steffens to develop his own probable cause. Schmeichel also stated he wanted to remain anonymous.

Steffens followed Vander Leest and pulled him over roughly a half-mile or mile from Ned Kelly's bar. (PPFOF ¶ 69.) In addition to Vander Leest, there were two passengers, who had also been previously drinking, in the car. Steffens testified that before he pulled him over, he noted that Vander Leest was speeding (42 mph in a 25 mph zone), crossed over a line separating two southbound lanes twice, and deviated into the fog-line area on the right side of the street, but Vander Leest's denial places these facts in dispute as well. Steffens also testified that he smelled alcohol coming from the vehicle and noticed a glossy appearance in Vander Leest's eyes. (DPFOF ¶¶ 71-73.)

Prior to pulling Vander Leest over, Officer Steffens requested that a supervisor be sent to monitor the situation, evidently because of the delicate situation involved in stopping a City alderman. In response to Steffens' request, Lt. Jerry Johnson soon arrived on the scene to monitor and record the stop. Steffens conducted three different field sobriety tests. First, he performed a horizontal gaze nystagmus ("HGN") test, which measures how a subject's eyes follow the tip of an officer's pen. The test requires that the subject keep his head still, and by Steffens' account, Vander Leest failed to do so on multiple attempts. Steffens then asked Vander Leest to perform the "walk and turn" test, in which the subject is asked to place his right foot in front of his left and walk a straight line, heel-to-toe, for nine steps before turning around. According to Steffens, Vander Leest was unable to perform this test either: he took 29 steps instead of nine, his line was

4

not straight, and he failed to touch his feet together when he walked. Steffens halted the test because it appeared to him that Vander Leest would be unable to complete it properly. Finally, Steffens had Vander Leest perform the one-leg standing test. Vander Leest was asked to count upwards from 1001 while holding one of his feet off the ground. Again according to Steffens, Vander Leest was unable to do this: he placed his foot back down after counting to 1003, and when he raised it again the officers on-scene had to steady him because they thought he would fall over.

Vander Leest did not believe he was drunk, however, and denies that he did as poorly on the tests as Steffen's report states. Although he admitted to having several drinks, he requested that he be given a breath test. The officers conducted the breath test utilizing a portable preliminary breath test ("PBT"), but the machine stated that there was no alcohol in his system at all.[3] To the officers, this result meant that the machine was malfunctioning because Vander Leest appeared drunk, had just left a bar at closing time, and he had already admitted to having several drinks. The officers then obtained two newer PBTs, but these also malfunctioned and did not show the presence of any alcohol in Vander Leest's system. In any event, Officer Steffens placed Vander Leest under arrest

---

[3] A PBT is a screening device that is used to confirm whether a person suspected of driving under the influence has been drinking. The result of the test may be used by a law enforcement officer for the purpose of deciding whether or not the person should be arrested for OWI or whether or not to require or request a chemical test that precisely measures the amount of alcohol in a persons blood or breath. The results of a PBT are not admissible at trial, however. Wis. Stat. § 343.303. PBT results are not determinative of probable cause to arrest both because they are not considered sufficiently accurate and because they only test for alcohol. Other substances, either alone or in combination with alcohol, can also impair a driver. Thus, a low PBT result does not void the grounds for arrest. *County of Dane v. Sharpee*, 154 Wis. 2d 515, 518-19, 453 N.W.2d 508 (Ct. App. 1990) (holding that probable cause for driving while intoxicated is not voided by a preliminary breath test, administered on the scene, that indicates a blood alcohol content of .01 percent).

5

because, according to Officer Steffens, he had failed the field sobriety tests and Officer Steffens believed he was too impaired to drive.

The officers took Vander Leest to the hospital, where a sample of his blood was taken. He was briefly held in custody until a friend whom he had contacted arrived to drive him home. The sample was mailed to the State Laboratory of Hygiene where it was later tested. The results from the state lab showed Vander Leest's blood alcohol level at .031, less than half the legal limit of .08, and was negative for the presence of any other drugs. Based on this negative result, the citation for operating while intoxicated was voided. By that time, however, Vander Leest believes his reputation was severely damaged. Although he was re-elected to his office in the Spring 2008 election (he was unopposed), he lost his re-election bid in 2010 in part, he believes, because of his arrest. Vander Leest also claims that his arrest adversely affected his performance at his full-time job, which was already under scrutiny, and led to his termination.

## II. Analysis

Summary judgment is proper if there are no genuinely disputed material facts and the moving party establishes that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A court must construe the facts and draw all reasonable inferences in favor of the nonmoving party. *Trentadue v. Redmon,* 619 F.3d 648, 652 (7th Cir. 2010). Once the defendants have shown that the facts entitle them to judgment in their favor, the burden shifts to the plaintiff to identify some evidence in the record that establishes a triable factual issue. *Id.* To satisfy this burden, the plaintiff must show more than "some metaphysical doubt as to the material facts," *Springer v. Durflinger,* 518 F.3d 479, 484 (7th Cir. 2008), and neither speculation nor generic challenges to a witness's credibility are sufficient to satisfy this burden. *Id.*

**A. Fourth Amendment**

**1. Reasonable Suspicion for the Traffic Stop**

A traffic stop is a form of seizure triggering Fourth Amendment protections from unreasonable searches and seizures. *United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). But unlike an arrest, a traffic stop does not require probable cause. In order for such a stop to be lawful, police need only have "a reasonable suspicion, grounded in specific articulable facts and reasonable inferences from those facts, that an individual is violating the law." *State v. Gammons,* 2001 WI App 36, 241 Wis.2d 296, 301, 625 N.W.2d 623, 626 (Wis. Ct. App. 2001) (citing *Terry v. Ohio,* 392 U.S. 1, 19-20 (1968)). "A reasonable suspicion requires more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *United States v. Oglesby*, 597 F.3d 891, 894 (2010) (internal quotations omitted). The test, like the test for probable cause to arrest, is an objective one. *United States v. Rivera,* 906 F.2d 319, 321 (7th Cir. 1990).

Taking the facts in the light most favorable to Vander Leest, the non-moving party, Steffens was on two separate occasions told by Schmeichel, an ex-police officer, that Vander Leest was in a bar and looked like he was drunk. On the second occasion, Schmeichel indicated he was not certain that Vander Leest was drunk. Specifically, Schmeichel testified that "Officer Steffens asked if I was sure Mr. Vander Leest was drunk. I told him I was not, and I told him to establish his own probable cause and not go based on what I was saying because I wasn't 100 percent sure." (Josetti Aff., Ex. B. at 31.)

Based on this tip from an ex-officer, Officer Steffens argues that he had reasonable suspicion to stop Vander Leest. (As noted above, Steffens testified that he witnessed Vander Leest driving

7

erratically before he pulled him over, but Vander Leest disputes this and I therefore do not take Steffens' testimony on that score into account.) Steffens cites *State v. Rutzinski,* 2001 WI 22, 241 Wis.2d 729, 623 N.W.2d 516, 519 (Wis. 2001), where an officer responded to an anonymous tip that "a black pickup truck [was] weaving within its lane, varying its speed from too fast to too slow, and 'tailgating.'" The Wisconsin Supreme Court first observed that "informants' tips vary greatly in reliability. Thus, before an informant's tip can give rise to grounds for an investigative stop, the police must consider its reliability and content." 623 N.W.2d at 521. Citing *Illinois v. Gates,* 462 U.S. 213, 230 (1983), the court noted that "in assessing the reliability of a tip, due weight must be given to: (1) the informant's veracity; and (2) the informant's basis of knowledge." *Id.* "These considerations should be viewed in light of the 'totality of the circumstances,' and not as discrete elements of a more rigid test: '[A] deficiency in one [consideration] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability.'" *Id.* (quoting *Gates,* 462 U.S. at 233). The court further noted that sometimes "the allegations in the tip suggest an imminent threat to the public safety or other exigency that warrants immediate police investigation" even if the tip is not completely reliable. *Id.* at 523. "In such circumstances, the Fourth Amendment . . . [does] not require the police to idly stand by in hopes that their observations reveal suspicious behavior before the imminent threat comes to its fruition. Rather, it may be reasonable for an officer in such a situation to conclude that the potential for danger caused by a delay in immediate action justifies stopping the suspect without any further observation." *Id.* at 523-24.

The Wisconsin Supreme Court upheld the traffic stop in *Rutzinski*. In doing so, it focused on the fact that the tipster, although partially anonymous, had identified himself by stating that he

8

was driving in a vehicle right next to the one he was reporting for drunk driving. As such, he exposed himself to identification, which made the tip reliable. In addition, the tip was based on the witness' contemporaneous first-hand observation. Finally, the court noted that the driver posed an imminent threat to public safety by driving erratically. *Id.* at 526.

Here, Vander Leest focuses on the noncommital aspect of Schmeichel's tip. Specifically, if a jury were to believe Schmeichel's testimony, it would conclude that he was not "100 percent sure" that Vander Leest was drunk. Moreover, Schmeichel, an experienced police officer, told Steffens to establish his own probable cause before stopping Vander Leest. These statements, Vander Leest argues, lack the requisite concreteness to justify a traffic stop.

But in order for Steffens' stop of Vander Leest to be lawful, only reasonable suspicion was needed, and reasonable suspicion, like probable cause, is far less than 100% certainty. Based on the undisputed facts, I conclude that Steffens did have reasonable suspicion. The standards set forth in *Rutzinski*, which are based on Supreme Court precedent, suggest that the credibility of a witness is a key factor in establishing reasonable suspicion. Here, perhaps most importantly, the informant was not an anonymous caller as in *Rutzinski*. Schmeichel was an ex-police officer and was known to Officer Steffens. To the extent Vander Leest suggests that Steffens should have assumed that Schmeichel was lying about Vander Leest's condition, I conclude that such an assumption would not have been reasonable based on the record. Lying to a police officer under such circumstances would amount to obstructing an officer, a crime under Wisconsin law. *See* Wis. Stat. § 946.41. Whatever Schmeichel may have thought of Vander Leest, Steffens was not required to assume that Schmeichel would lie to him about Vander Leest's condition and expose himself to potential criminal liability simply to have Steffens pull him over and find out he was sober and unimpaired.

9

Vander Leest focuses most of his argument on the fact that Schmeichel was not certain Vander Leest was drunk. To the extent Schmeichel's confidence in his report was less than firm, however, that is not particularly surprising. Especially with a legal limit of .08 (as opposed to the former .10 limit), an individual over the limit will not always manifest obviously drunken behavior. In some cases a person's intoxication will be obvious, but in others it might be more subtle. After all, if intoxication were such a clear-cut question, officers would not need to conduct multiple field sobriety tests. In telling Steffens he was not certain that Vander Leest was drunk and he should develop his own probable cause, Schmeichel may have been simply conceding to the reality that such things are not always plain or perhaps attempting to insure his identity would not have to be revealed. In *Vermont v. Riefenstahl,* for example, the Vermont Supreme Court concluded that an officer had reasonable suspicion to make a traffic stop when an identified informant reported that the individual "was possibly intoxicated and driving." 172 Vt. 597 779 A.2d 675, 676 (Vt. 2001). "The informant here provided a detailed description of the vehicle, its make, model, license plate number, route and direction of travel. The informant also reported that the operator was possibly intoxicated. The named informant's tip contained sufficient indicia of reliability to justify the stop." *Id.* at 677. If absolute certainty were a requirement for establishing reasonable suspicion, tips regarding intoxicated drivers would seldom be viable.

In addition, Steffens was entitled to place significant weight on the fact that Schmeichel was a former police officer, whose ability to perceive such things was likely more elevated than the average citizen's. Courts have consistently counseled that common sense is to play a significant role in the consideration of reasonable suspicion challenges, *Rutzinski,* 623 N.W. at 521, but Vander Leest asks the Court to view the events of that evening with twenty-twenty hindsight and

overrule the common sense, reasonable judgment made by an officer in the middle of the night. This wasn't an anonymous tip phoned in at random but a suspicion voiced by an ex-officer who had personally observed Vander Leest – not at the library or church but in a bar at two o'clock in the morning.

It is also important to note that drunk driving, particularly at night, poses a heightened danger to the driving public, and Steffens was entitled to consider these exigent circumstances in making his stop. (Moreover, Vander Leest had passengers in his car who could also have been at risk.) Consider the alternative: is an officer in receipt of a reliable tip required to wait until he personally observes the driver swerve before he can pull the driver over? There are at least two problems with such a premise. First, not all drivers over the legal limit actually have difficulty controlling their automobiles, especially for short distances. The legal limit is just that: a *legal* definition of inebriation that does not necessarily correlate to *biological* intoxication in every driver. In other words, a driver can be guilty of OWI even while in reasonable control of his automobile (particularly for short periods of time), and thus requiring an officer to make a personal observation would prohibit the stopping of such drivers. The second problem is that forcing officers who already have a reasonable suspicion that a driver is intoxicated to wait for independent evidence of drunk driving puts the public and the driver's passengers at greater risk. If the officer is tailing a suspected drunk driver on a deserted straight road, he might have the luxury of waiting and observing. But Vander Leest was stopped near downtown Green Bay. The first sign of impaired driving could arise when the driver is faced with oncoming traffic, a bend in the road, or a patch of ice on a frigid March evening. "When the tip is reliable, the Fourth Amendment does not require an officer to wait until the suspect does something that puts lives in danger. The Fourth

11

Amendment . . . [does] not require the police to idly stand by in hopes that their observations reveal suspicious behavior before the imminent threat comes to its fruition." *Rutzinski,* 623 N.W.2d at 523.

Finally, a traffic stop is, unless probable cause arises out of it, typically a brief and unobtrusive investigative tool law enforcement uses to insure public safety. *See Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984) (noting that typically, traffic stop "means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions"). In this case, for example, had Vander Leest been able to quickly dispel Steffens' suspicions and no arrest taken place, Vander Leest would have suffered none of the consequences which give rise to this action. It is for this reason that the significantly lesser showing of reasonable suspicion is required, as opposed to probable cause.

In sum, Officer Steffens received a tip from an ex-police officer he knew that a driver appeared drunk, and Steffens had no reason to doubt the ex-officer's credibility. The fact that the ex-officer, who wanted to remain anonymous, was not 100 percent certain and told Steffens to develop his own probable cause, does not mean that Steffens was required to disregard the information he conveyed. Given the time of night and the fact that Vander Leest had just left a bar at closing time, Officer Steffens was justified in stopping Vander Leest's car to investigate further upon reasonable suspicion of impaired driving even absent evidence that Vander Leest was actually driving erratically.

**2. Probable Cause for the Arrest**

Vander Leest further argues that Officer Steffens lacked probable cause to arrest him, or at least that disputes about material facts exist. Although Steffens claims that Vander Leest failed almost every aspect of the field sobriety test, Vander Leest denies that he did. Steffens stated that Vander Leest's eyes were glossy, his speech was slurred, he was unsteady on his feet, and his breath smelled of alcohol, but Vander Leest disputes each of these points. At the summary judgment stage factual disputes must be resolved in Vander Leest's favor, and he argues that the question of probable cause must therefore go to a jury.

Probable cause for an arrest is a higher standard than reasonable suspicion. "Probable cause exists if, at the time of arrest, the officers possess knowledge from reasonably trustworthy information that is sufficient to warrant a prudent person in believing that a suspect has committed, or is committing, a crime." *United States v. Brown,* 366 F.3d 456, 458-459 (7th Cir. 2004). "Probable cause is a fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *Id.* Police officers "are entitled to rely on their experience in assessing probable cause," which means their on-the-spot judgments deserve deference from reviewing courts. *Id.*

Steffens argues that this Court may find probable cause as a matter of law even if it resolves all factual disputes in favor of Vander Leest. For example, Vander Leest does not dispute that the smell of alcohol was emanating from his car. (He suggests it was coming from his passengers rather than himself.) In addition, it is undisputed that he took 29 steps during the walk-and-turn test when asked to take only 9 steps, and he failed to follow Steffens' instructions during the HGN test because he moved his head at least once after being instructed not to move it. Finally, although

13

Vander Leest disputes that his eyes were "glossy," as a practical matter his inability to perceive how his own eyes looked while he was speaking to Officer Steffens would not allow him to meaningfully contest that point.[4]

Nor does Vander Leest dispute that he admitted to Steffens that he had been drinking. The transcript of a recording of the arrest further indicates that Vander Leest admitted to having at least five drinks:

| | |
|---|---|
| Officer Steffens: | I asked if you'd been drinking. You said you had five drinks. You had two in DePere, three or four downtown. |
| Vander Leest: | Right. |

(Dkt. # 48, Ex. 17 at 11.)

Vander Leest then immediately protested, "That's not much." (*Id.*) Vander Leest thus did not deny that he had at least five drinks – he admitted it – and based his protest with Steffens on the argument that five drinks was "not much." Based on all of this evidence, in addition to the tip from Schmeichel that Vander Leest appeared drunk while leaving a bar at closing time, Steffens argues that he had probable cause to make the arrest.

Vander Leest insists that five drinks is indeed "not much" because he is a 280-pound man and consumed the drinks over more than four hours. According to standardized blood alcohol calculators, Vander Leest argues that a man of his size would have only a .021 BAC (well below the legal limit) if he consumed 5 drinks over 4 hours. A reasonable police officer in Steffens' position should have recognized that. In addition, Vander Leest did not "fail" any of the field

---

[4]The declarations of two of Vander Leest's friends do not speak to how his eyes looked after he left Ned Kelly's bar.

sobriety tests because his errors were not egregious enough (accepting his version of events) to justify a finding that he was intoxicated. (Dkt. # 65, ¶ 100.)

Ultimately, Vander Leest's arguments amount to hair-splitting. First, although Officer Steffens apparently assumed Vander Leest's drinking had occurred over the entire evening (Steffens Depo at 71), there is no evidence in the record that Vander Leest ever told Steffens he had consumed the five drinks over a long period of time. In fact, the transcript suggests otherwise. Vander Leest protested that five drinks was "not much" but did not elaborate. For all Steffens knew, Vander Leest had consumed five drinks in the last two hours at bars in De Pere and downtown Green Bay. In addition, the definition of a "drink" is notoriously flexible. A light beer or a shot could count as a drink, but so could a martini or a whiskey and soda with two or three shots of liquor in them. (Vander Leest had been drinking mixed drinks as well as beer, although there is no indication Officer Steffens knew these details.)

Moreover, although it is commonly known that an individual's size plays a role in his blood alcohol levels, a police officer is not expected to rely on such generalizations. First, such a proposition is premised on the officer taking the suspect's word for how many drinks he had consumed during a given period of time, and how potent those drinks were. Under Vander Leest's theory, Steffens should have believed Vander Leest and let him go simply because he was a larger man. Second, as Steffens explained to Vander Leest during the stop, everyone processes alcohol differently. The Wisconsin Department of Transportation ("DOT") website Vander Leest cites in support of his argument explicitly notes this variability:

> Your actual BAC is dependent on many complex factors, including your emotional and physical condition and health, and what you've recently ingested (including food, water, medications and other drugs).

15

    * No blood/breath alcohol calculator is 100% accurate.
    * The best that can be done is a rough estimation of your BAC level.

http://www.dot.wisconsin.gov/safety/motorist/drunkdriving/calculator.htm (last visited December 22, 2010). The DOT website also cautions users not to use the calculations it offers as a guideline of how much they can drink and safely drive:

> You should not consider this to be a guideline for how much you can drink and still drive responsibly, or avoid being arrested! The best policy is don't drink and drive. Period.

*Id.* In other words, the estimates for BAC based on an individual's weight are rule-of-thumb calculations, and Vander Leest has not cited any case even suggesting that an officer is required to make a probable cause determination on that basis. In fact, Vander Leest himself did not even fit the very model that he now insists the officer should have used. At the hospital Vander Leest was tested and showed a BAC of .031 (after some time had passed) – roughly fifty percent more than the .021 BAC produced by an estimate based on his weight and the number of drinks he consumed.

  Finally, Vander Leest's argument that Steffens should have known his BAC was not over .08 ignores the fact that he was arrested for operating under the influence of an intoxicant. A BAC above .08 is not an element of that offense. The Wisconsin pattern jury instruction for operating under the influence state that "[w]hat must be established is that the person has consumed a sufficient amount of alcohol [and/or another intoxicant] to cause the person to be less able to exercise the clear judgment and steady hand necessary to handle and control a motor vehicle." WIS JI-CRIMINAL 2663 (2006). Wisconsin law treats a BAC as low as .04 as relevant evidence on the issue of intoxication. Wis. Stat. § 885.235(1g)(b). In sum, Steffens was not required to base his

probable cause determination on assumptions about the period of time over which Vander Leest had been drinking or his size.

Under the totality of the circumstances (accepting Vander Leest's and Schmeichel's version of events), Officer Steffens had probable cause to make the arrest. He had received a tip from an ex-officer who he reasonably regarded as reliable. Vander Leest was leaving a bar after it closed. He admitted to consuming at least five drinks, and his car smelled of alcohol. Steffens states that Vander Leest flunked all three field tests, but even accepting Vander Leest's word that his performance on the tests was not nearly so bad, an officer in Steffens' position would have been justified in arresting Vander Leest based on Vander Leest's admission that he had consumed at least five drinks, had just left a bar, his car smelled of alcohol, and he turned in a flawed performance (walking 29 steps instead of 9) on the walk-and-turn test.

If probable cause were an academic exercise conducted in the light of day with no constraints of time or resources, hindsight might allow us to accept Vander Leest's present position. The facts later showed that he was not over the legal limit – or even at *half* of the limit. He is a large man who admitted to consuming five drinks over an extended period of time. And if Vander Leest is believed, he did not do terribly poorly on two of the three field tests, and his speech was not slurred. But decisions of officers in the field are afforded deference, *United States v. Hobbs,* 509 F.3d 353, 359 (7th Cir. 2007), which means that when there are close cases they must tilt in the government's favor lest courts overrule the considered, on-site judgments of experienced law enforcement officers. Courts have repeatedly reaffirmed that "probable cause is a commonsense, nontechnical conception that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (citation omitted). To find

17

otherwise here would ignore this principle. It would also set an unfortunate precedent, as accepting Vander Leest's arguments would encourage officers to allow borderline drunk drivers back on the street, putting their passengers and the public at risk. Accordingly, I conclude that the Defendants are entitled to summary judgment for claims arising out of the stop and arrest.

**B. State Law Claims**

Having disposed of Vander Leest's federal claims, I must now decide whether to retain jurisdiction over his state law claims against the defendants. "[T]he general rule is that, when all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolving them on the merits." *Wright v. Associated Ins. Companies Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994). But this is not always so. "There are . . . unusual cases in which the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, convenience, fairness and comity-will point to federal decision of the state-law claims on the merits." *Id.* The case law has established three exceptions to the general rule that supplemental federal jurisdiction over state law claims should be relinquished when the federal claims are dismissed: "when the refiling of the state claims is barred by the statute of limitations; where substantial judicial resources have already been expended on the state claims; and when it is clearly apparent how the state claim is to be decided." *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (citing *Wright*, 29 F.3d at 1251-52). A fourth exception is set forth in the statute that provides for supplemental jurisdiction: "the claim raises a novel or complex issue of State law." 28 U.S.C. § 1367(c)(1); *Williams Electronics Games, Inc. v. Garrity*, 479 F.3d 904, 907-08 (7th Cir. 2007).

18

In this case, it is clearly apparent how Vander Leest's false arrest and imprisonment claim against the Green Bay defendants should be decided based on the determination of his federal claims. Having found that the undisputed facts establish probable cause for Vander Leest's arrest, it necessarily follows that his brief confinement was lawful and his false imprisonment claim must fail. *See Maniaci v. Marquette University*, 50 Wis.2d 287, 295, 184 N.W.2d 168, 172 (1971) (noting that "a 'lawful' restraint does not constitute false imprisonment"). It is also apparent that his other state law claims against the Green Bay defendants fail. His claim for intentional infliction of emotional distress fails because the report and subsequent probable cause finding were not extreme and outrageous.[5] Similarly, his Wis. Stat. § 134.01 claim fails because there is no evidence that the officers intended to harm Vander Leest's business. Vander Leest alleges that the officers conspired to run him out of office, but such a claim is based only on bare, generalized allegations rather than anything specific linking Steffens or Johnson to any animus against Vander Leest. Under these circumstances, I decline to relinquish jurisdiction over Vander Leest's state law claims against Steffen, Thomas, the City and its insurer, and instead order those claims dismissed on their merits.

I reach a different conclusion, however, with respect to Vander Leest's claim for defamation against Schmeichel. Although the parties have completed discovery and fully briefed the issue, this is usually the case when the general rule comes into play. Presenting the issue in a state forum should not require duplicating this work; it simply shifts it to another forum. More importantly, I

---

[5]A claim for intentional infliction of emotional distress contains four elements: (1) the defendant intended to cause emotional distress by his or her conduct; (2) the conduct was extreme and outrageous; (3) the conduct was a cause-in-fact of the plaintiff's emotional distress; and (4) that the plaintiff suffered an extreme disabling response to the defendant's conduct. *Rabideau v. City of Racine,* 2001 WI 57, ¶ 33, 243 Wis. 2d 486, 501, 627 N.W.2d 795, 802-803 (Wis. 2001).

am satisfied that resolution of this claim, if possible at this stage, would require this court to resolve novel or at least complex issues of state law. This is precisely what the general rule requiring district courts to relinquish jurisdiction under such circumstances is intended to avoid: "the general rule that we have cited is designed to minimize the occasions for federal judges to opine on matters of state law." *Van Harken v. City of Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997). Under these circumstances, comity, that is, "respect for the state's interest in applying its own law, along with the state court's greater expertise in applying state law, become paramount concerns." *Huffman v. Hains*, 865 F.2d 920, 923 (7th Cir. 1989). Retention of federal jurisdiction over state claims after federal claims have dropped is appropriate under some circumstances. For example, "if it is absolutely clear that the pendent claim[s] can be decided in only one way, the district judge can and should decide [them], to save the time of the state court." *Martin-Trigona v. Champion Federal Sav. & Loan Ass'n*, 892 F.2d 575, 578 (7th Cir.1989). Vander Leest's claim for defamation, however, is not such a claim. Accordingly, I conclude that the prudent course is to order it dismissed without prejudice for lack of jurisdiction.

**D. Conclusion**

For the reasons stated above, the Defendants' motions for summary judgment are **GRANTED** and the all claims against the Green Bay defendants are **DISMISSED** with prejudice. Plaintiff's defamation claim against Defendant Schmeichel is **DISMISSED** without prejudice for lack of jurisdiction. The Clerk shall enter judgment accordingly.

**SO ORDERED** this 28th day of December, 2010.

s/ William C. Griesbach
WILLIAM C. GRIESBACH
United States District Judge